IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| MARILYN BRYANT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:15-cv-00474 |
| ) | |
| HTI MEMORIAL HOSPITAL ) | Chief Judge Sharp |
| CORPORATION d/b/a TRISTAR ) | |
| SKYLINE MADISON, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

This litigation under (1) Title VII of the Civil Rights Acts of 1964 ("Title VII"), (2) 42 U.S.C. § 1981, and (3) the Tennessee Human Rights Act ("THRA") arose after Plaintiff Marilyn Bryant was discharged from her employment at Defendant HTI Memorial Hospital Corporation d/b/a TriStar Skyline Madison Campus. These causes of action are based on the allegation that Defendant discriminated against Plaintiff because of her race when Defendant terminated Plaintiff on June 5, 2014. Defendant has filed a Motion for Summary Judgment on all claims, (Docket No. 23), to which Plaintiff has responded, (Docket No. 31), and Defendant has replied, (Docket No. 33). The Court will grant Defendant's Motion and this case will be dismissed.

## BACKGROUND

The following facts are undisputed unless otherwise noted.

Defendant is an inpatient and outpatient treatment facility that offers healthcare to adults and adolescents struggling with psychiatric disorders and behavioral concerns. Defendant employed Plaintiff, full-time, as a Registered Nurse ("RN") from April 26, 2010 to June 5, 2014.

1

Beginning in 2011, Plaintiff worked primarily in Defendant's Adolescent Unit. Plaintiff was also competent and qualified to work in other parts of the hospital too.

Pam Mitchell ("Ms. Mitchell"), another RN, asked Plaintiff to fill in for her during the day shift on June 5, 2014. Plaintiff agreed. However, on that day and prior to that shift, Ms. Jamie White ("Ms. White"), the nursing supervisor, who oversaw the Adolescent Unit, assigned Plaintiff to float the Adult Unit. While parties dispute specifically how Plaintiff responded to this directive, they agree that Plaintiff's "initial refusal to float resulted in Plaintiff arriving to the Adult Unit 30 minutes late." (Docket No. 32 at 5). This delay caused an RN working in the Adult Unit to stay after her shift ended. Plaintiff admits that this delay likely caused Defendant to incur overtime compensation costs.

Ms. White reported this incident to Jill Howard ("Ms. Howard"). Ms. Howard is Defendant's Chief Operating Officer and served as the interim manager of the Adolescent Unit, the unit where Plaintiff primarily worked, from April 28, 2014 to August 11, 2014. Plaintiff was specifically supervised by Ms. Howard from April 28, 2014 until the time of her termination.

Ms. White relayed to Ms. Howard Plaintiff's delay in arrival to her Adult Unit shift and her initial refusal to float. Ms. Howard confirmed with Penny Mathis, an employee who witnessed Plaintiff's conduct, that these events had occurred. Around this time, Ms. Howard received several other employee complaints about Plaintiff. These complaints accused Plaintiff of being "abusive, rude, confrontational, and a bully toward her coworkers. [They further assert that Plaintiff was] not a 'team player' and 'rarely assist[ed] coworkers when needed or requested.'" (Docket No. 32 at 6, ¶ 2). Plaintiff admits that none of these complaints referenced her race in any manner.

2

On completion of her investigation, Ms. Howard concluded that Plaintiff's actions had violated Defendant's RN Floating Policy and its Behavioral Standards Policy. Defendant's Floating Policy ensures that patients receive timely and effective care from competent and qualified RNs at all times. Every RN is expected to abide by the RN Floating Policy. All RNs, except certain new hires, are expected to float. According to established practice in the Adolescent Unit, nursing supervisors assign RNs to float to other units. If a nursing supervisor assigns an RN to float, the RN is required to float.

Defendant's Behavioral Standards Policy outlines expectations relating employee conduct in the workplace. Defendant's "mission statement" for Behavioral Standards is that employees "pledge to treat others with loyalty, respect and dignity." (Docket No. 32 at 2). In tandem with this mission, bullying is prohibited conduct because employees are expected to "treat others with compassion and kindness." Id. Plaintiff admits that bullying coworkers and refusing the instructions of supervisors would violate Defendant's Behavioral Standards.

Ms. Howard expects all of the employees she is responsible for to comply with all of the Defendant's policies and procedures governing the performance of their job duties including the Defendant's Behavioral Standards Policy. Ms. Howard is responsible for disciplining employees who do not meet her performance or behavioral expectations. Because of Plaintiff's above-mentioned conduct, Ms. Howard and Plaintiff met around 2:30 p.m. on June 5, 2014 to discuss a corrective action plan. The plan, which was presented as a final written warning, was as follows:

> (1) Going forward, Plaintiff would follow her supervisors' instructions; (2) [t]he Hospital would pay for Plaintiff to attend workplace sensitivity training; and (3) Plaintiff would re-acknowledge the requirements of her RN Job [D]escription and the Hospital's Behavioral Standards.

(Docket No. 32 at 7). Ms. Howard had no intention of terminating Plaintiff going into her June 5, 2014 meeting. During this meeting, Ms. Howard gave Plaintiff a copy of her Employee Corrective Counseling Performance Improvement Plan. As part of this Plan, Ms. Howard asked Plaintiff to re-sign her "job description and the Behavioral Standards [Policy]." (Docket No. 37-6 at 2, ¶ 6). Although Plaintiff admits at her deposition that the expectations, outlined in the RN Job Description and the Behavioral Standards Policy, were reasonable, Plaintiff did not sign these documents because she believed them to be an admission of guilt based on alleged representations made by Ms. Howard. Plaintiff believed it was in her "best interest" not to sign them (although she signed them earlier in her employment) because she denied the accusations that she had bullied others. (Docket No. 32 at 8). Ms. Howard saw this refusal as evidence that Plaintiff would not comply with the obligation required by her job in the future. Ms. Howard then discharged Plaintiff based on her behavior at the June 5th meeting. Plaintiff admits that race was never mentioned in this meeting and that Ms. Howard had never previously acted toward her with racial bias.

On June 10, 2014, Plaintiff filed a charge of race discrimination against the Defendant with the Tennessee Human Rights Commission and the Employment Equal Opportunity Commission. The only date of discrimination listed in the charge is June 5, 2014, the date of Plaintiff's dismissal. After receiving a "notice of right to sue" on January 22, 2015, Plaintiff filed suit against Defendant on April 22, 2015. The underlying factual allegations of the Complaint relate only to the events on June 5, 2014.

4

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where a moving party without the burden of proof at trial seeks summary judgment, the movant "bears the initial burden of showing that there is no material issue in dispute." Lindsay v. Yates, 578 F.3d 407, 414 (6th Cir. 2009) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "Once a moving party has met its burden of production, 'its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'" Blizzard v. Marion Tech. Coll., 698 F.3d 275, 282 (6th Cir. 2012) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)). "Reviewing the facts in the light most favorable to the nonmoving party, the court must ultimately determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Blizzard, 698 F.3d at 282 (citations and internal quotation marks omitted).

## ANALYSIS

Plaintiff's two federal law claims, under Title VII and § 1981, and state law claim, under the THRA, are subject to a similar analytical framework. Plaintiff does not, and cannot, present direct evidence of racial discrimination. Instead, Plaintiff relies on circumstantial evidence. Circumstantial evidence involves the use of the burden shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). "The burden-shifting framework applies to all of [Plaintiff's] statutory causes of action under Title VII, § 1981, and the THRA." Michael v. Caterpillar Fin. Servs. Corp., 496 F.3d 584, 593 (6th Cir. 2007) (citing Newman v. Fed. Express Corp., 266 F.3d 401, 406 (6th Cir.2001) ("applying the

5

McDonnell Douglas framework to claims under these three acts")). "[Plaintiff] bears the initial burden under [this] framework of demonstrating the *prima facie* elements of her Title VII claim." Id. "In order to establish a *prima facie* case, [Plaintiff] must show that she (1) is a member of a protected group, (2) suffered an adverse employment action, (3) was qualified for the position, and (4) . . . was treated differently from similarly situated members of the unprotected class." Id.

> "Once a *prima facie* case has been shown, the plaintiff is entitled to a presumption that the defendant discriminated against him or her in violation of Title VII. The defendant then bears the burden of production to put forth a legitimate, nondiscriminatory reason for the complained of adverse treatment. The explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant meets this burden, the presumption of discrimination created by the prima facie case falls away and the plaintiff then needs to show that the defendant's legitimate nondiscriminatory reason was a pretext for discrimination. Throughout this burden-shifting approach, the plaintiff continues to bear the ultimate burden of proving, by a preponderance of the evidence, the intent to discriminate."

Sybrandt v. Home Depot, U.S.A., Inc., 560 F.3d 553, 557–58 (6th Cir. 2009).

Parties only dispute whether Plaintiff has satisfied the fourth element of her *prima facie* claim. Plaintiff, who is black, asserts, that in being terminated, she was treated differently than two allegedly "similarly situated" employees: Jaris Bragan ("Mr. Bragan") and Rebecca Early ("Ms. Early"), who are both white. Plaintiff, however, is incorrect.

When a plaintiff compares his/her alleged discriminatory treatment to treatment of non-minority employees, "the plaintiff must show that the 'comparables' are similarly situated *in all respects.*" Singfield v. Akron Metro. Hous. Auth., 389 F.3d 555, 562 (6th Cir. 2004) (emphasis in original) (citation omitted). To serve as a proper comparison, as Defendant correctly points out, "the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same

conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992) (citations omitted).

Ms. Howard's decision to terminate Plaintiff seems to have been based mainly on Plaintiff's refusal to reaffirm her commitment to abide by the RN Floating Policy. Plaintiff cannot compare herself to Mr. Bragan because he is neither an RN nor is he subject to the RN Floating Policy. For these reasons alone, Mr. Bragan and Plaintiff are not similarly situated, let alone "in all respects." See Singfield v. Akron Metro. Hous. Auth., 389 F.3d at 562. Additionally, Ms. Howard, who terminated Plaintiff, was not involved in deciding whether to discipline Mr. Bragan for his alleged misconduct. See Smith v. Leggett Wire Co., 220 F.3d 752, 762 (6th Cir. 2000) ("The comparisons are inapt however, because [Plaintiff] was disciplined by a different decisionmaker and engaged in different conduct than [those Plaintiff compared himself to.]") (citations omitted).

Even though Ms. Early is an RN and was accused of bullying, like Plaintiff, she was never accused of violating the Defendant's RN Floating Policy, unlike Plaintiff. It was Plaintiff's violation of Defendant's RN Floating Policy that led Ms. White to complain to Ms. Howard that Plaintiff refused to float. Therefore, Plaintiff and Ms. Early were not engaged in the "same conduct" which, alone, could explain the difference in the way Ms. Howard treated Plaintiff and Ms. Early. See Jackson v. FedEx Corp. Servs., Inc., 518 F.3d 388, 394 (6th Cir. 2008) ("the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be *relevant* in 'all of the relevant aspects.'") (emphasis in original) (citation omitted).

Plaintiff fails to establish a *prima facie* case of race discrimination. She presents no evidence for this Court to find that she was terminated because of her race. Plaintiff did not immediately obey instructions to float to the Adult Unit. This caused a delay and forced the Defendant to absorb overtime compensation costs. The parties agree that Ms. Howard did not enter the meeting on June 5, 2014 intending to dismiss Plaintiff. It was only after it appeared to Ms. Howard that Plaintiff was not fully committed to complying with the RN Floating Policy and the Defendant's Behavioral Standards Policy that Plaintiff was terminated. "Importantly, we must not second guess the business judgment of the employer, but simply evaluate 'whether the employer gave an honest explanation of its behavior.'" McConnell v. Swifty Transp. Inc., 198 F. App'x 438, 443 (6th Cir. 2006) (internal citation omitted). Defendant's policies, procedures, and protocols are required to facilitate the supply of proper health services to Defendant's patients. This Court finds that Ms. Howard was well within her discretion to terminate Plaintiff.

Because Plaintiff failed to establish a *prima facie* case of race discrimination under Title VII, "[Plaintiff's] remaining claims under Section 1981 and Tennessee state law [the THRA] must fail as well." See Newman v. Fed. Exp. Corp., 266 F.3d 401, 406 (6th Cir. 2001).

## CONCLUSION

On the basis of the foregoing, Defendant's Motion for Summary Judgment will be granted on Plaintiff's federal and state law claims. A separate Order shall follow.

KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE